UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TIMOTHY MATHEWS,

                       Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

_____

<u>DECISION & ORDER</u>

19-CV-0073MWP

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Timothy Mathews ("Mathews") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Mathews's motion for judgment on the pleadings is denied.

## DISCUSSION

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings");

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform his past work; and

(5)     if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


## II.     The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  Under step one of the process, the ALJ found that Mathews had not engaged in

substantial gainful activity since September 12, 2014, the alleged onset date.  (Tr. 18).[1]  At step

two, the ALJ concluded that Mathews had the severe impairments of asthma and adjustment

disorder.  (*Id.*).  The ALJ also found that Mathews had a past medical history of diabetes and

cholesterol issues, both of which were not severe.  (*Id.*).  At step three, the ALJ determined that

Mathews did not have an impairment (or combination of impairments) that met or medically

equaled one of the listed impairments in the Listings.  (Tr. 19).

The ALJ concluded that Mathews retained the RFC to perform a full range of

work at all exertional levels "with no significant exertional, postural, or manipulative

limitations."  (Tr. 20).  The ALJ found, however, that Mathews was not able to work in cold

temperatures or in exposure to high concentrations of dust, fumes, gases, and other pulmonary

irritants.  (*Id.*).  The ALJ also limited Mathews to routine and repetitive tasks only, tasks

requiring no more than occasional public contact or interactions with coworkers, and tasks

without a strong production pace element.  (*Id.*).  At steps four and five, the ALJ found that

---

[1]  The administrative transcript (Docket # 7) shall be referred to as "Tr. ___," and references thereto utilize
the internal Bates-stamped pagination assigned by the parties.

Mathews had no past relevant work but, based on Mathews's age, education, work experience, and RFC, that other jobs existed in significant numbers in the national economy that he could perform, such as fruit distributor, marker II, and mail clerk, all of which were classified as unskilled work with a specific vocational preparation ("SVP") level of two.  (Tr. 25-27). Accordingly, the ALJ found that Mathews was not disabled.  (Tr. 27).


III.   **Mathews's Contentions**

Mathews contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error.  (Docket ## 11, 14).  First, Mathews argues that the ALJ improperly evaluated the October 5, 2017 mental RFC questionnaire completed by Marci Dodds ("Dodds"), LMSW, Mathews's treating mental health counselor.  (Docket # 11-1 at 10-16).  Second, Mathews maintains that by rejecting both opinions evaluating his mental limitations, the ALJ improperly reached a mental RFC determination based on his own lay interpretation of the medical evidence.  (*Id.* at 16-20).[2]


IV.   **Analysis**

A.   **The ALJ's Evaluation of Dodds's Mental RFC Questionnaire**

I turn first to Mathews's argument that the ALJ failed to properly evaluate Dodds's opinion.  (Docket # 11-1 at 16).  In Mathews's view, the ALJ "failed to consider the relevant factors for evaluating treating opinions" and provided insufficient reasons for "rejecting" Dodds's opinion.  (*Id.*).  I disagree.

---

[2]   Mathews's contentions relate only to the mental aspect of the ALJ's RFC determination.  Therefore, I address only the mental portion of the RFC.  *See*, *e.g.*, *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 394 n.3 (W.D.N.Y. 2018) ("[p]laintiff challenges only those portions of his RFC relating to his mental limitations[;] . . . [a]ccordingly, this [d]ecision and [o]rder addresses the RFC only as it pertains to [p]laintiff's mental limitations").

Under the regulations in effect at the time Mathews's claim was filed, licensed social workers, such as Dodds, are not considered "acceptable medical sources," *see* 20 C.F.R. §§ 404.1513(a), 416.913(a) (previous versions effective until March 26, 2017),[3] but are considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d). Applicable regulations also provide, however, that an ALJ should "evaluate every medical opinion" received regarding a claimant's impairments, "[r]egardless of its source." 20 C.F.R. §§ 404.1527(c), 416.927(c).[4] In evaluating opinions from non-acceptable medical sources such as licensed social workers, an ALJ should consider the following factors:

(1)    the frequency of examination and length, nature, and extent of the treatment relationship;

(2)    the evidence in support of the physician's opinion;

(3)    the consistency of the opinion with the record as a whole;

(4)    whether the opinion is from a specialist; and

(5)    whatever other factors tend to support or contradict the opinion.

*See* 20 C.F.R. §§ 404.1527(c), (f), 416.927(c), (f). An ALJ may use "other source" opinions to evaluate "important issues like the severity of a[] [claimant's] impairment and any related functional effects." *Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 432 (W.D.N.Y. 2018). Moreover, an ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a

---

[3] These regulations were amended effective March 27, 2017, but only with respect to claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *see*, *e.g.*, *Pilaccio v. Comm'r of Soc. Sec. Admin.*, 2017 WL 2789023, *3 (E.D.N.Y. 2017). The Court cites the version of the regulations in effect when the claim was filed.

[4] This regulation applies to claims filed before March 27, 2017. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

6

claimant or subsequent reviewer to follow the [ALJ's] reasoning[] when such opinions may have

an effect on the outcome of the case."  20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).  In other

words, an ALJ "may not disregard opinion evidence from a [non-acceptable medical] source

simply because the evidence is from such a source."  *Barco v. Comm'r of Soc. Sec.*, 330

F. Supp. 3d 913, 920 (W.D.N.Y. 2018).

Mathews sought treatment at Wyoming County Mental Health Clinic (the

"Clinic") in April 2014 (which was the first contact he had made with the Clinic since May 2009

(Tr. 289)), first treating with Sarah McCumiskey ("McCumiskey"), LMHC, and then with Dodds

beginning in August 2014.  (Tr. 295, 322).  Throughout his treatment at the Clinic, for which

there are treatment notes from April 2014 through September 2015, Mathews also underwent

medication management from psychiatrist Mark Varallo ("Varallo"), MD.  (*See* Tr. 289-90, 320,

326, 332, 342, 355, 363).

On October 5, 2017, Dodds completed a mental RFC questionnaire on behalf of

Mathews.  (Tr. 1556-60).  She indicated that Mathews received psychotherapy approximately

every two to four weeks; received medication management every one to three months; "has been

receptive to treatment" for his diagnoses – which were consistently noted to be adjustment

disorder with depressed mood (*see*, *e.g.*, Tr. 302, 324, 365); and was currently well tolerating his

medications.  (Tr. 1556).  At the time of Dodds's assessment, Mathews had a global assessment

of functioning ("GAF") of 60, which was slightly lower than his highest GAF of 65 the previous

year.  (*Id.*).

Dodds's clinical findings revealed that Mathews suffered from depressed mood,

experienced periods of feeling hopeless and helpless, had negative thoughts, and became easily

overwhelmed and frustrated.  (*Id.*).  Mathews's symptoms included decreased energy, difficulty

thinking or concentrating, emotional withdrawal or isolation, intense and unstable interpersonal

relationships and impulsive and damaging behavior, perceptual or thinking disturbances, deeply

ingrained, maladaptive patterns of behavior, easy distractibility, sleep disturbances, and recurrent

severe panic attacks occurring at least once a week on average.  (Tr. 1557).  In Dodds's view,

Mathews's prognosis was "fair to good with continued 1:1 psychotherapy and medication

management."  (Tr. 1556).

Dodds also opined that Mathews's impairments and symptoms affected his ability

to perform work-related activities on a day-to-day basis in a regular work setting.  (Tr. 1558).

Regarding the mental abilities and aptitudes needed to do unskilled work, Dodds opined that

Mathews was "unable to meet competitive standards" in multiple categories of activities:

maintaining regular attendance and being punctual within customary, usually strict tolerances;

sustaining an ordinary routine without special supervision; completing a normal workday and

workweek without interruptions from psychologically-based symptoms; performing at a

consistent pace without an unreasonable number and length of rest periods; asking simple

questions or requesting assistance; responding appropriately to changes in a routine setting;

dealing with normal work stress; and being aware of normal hazards and taking appropriate

precautions.  (*Id.*).[5]

As far as limitations related to semi-skilled and skilled work, Dodds opined that

Mathews was "unable to meet competitive standards" in understanding and remembering

detailed instructions, carrying out detailed instructions, and dealing with the stress of

semi-skilled and skilled work.  (Tr. 1559).  Dodds explained that Mathews "struggle[d] at times

---

[5]  On the mental RFC questionnaire completed by Dodds, the phrase "unable to meet competitive standards" was defined to mean that a "patient c[ould not] satisfactorily perform [an] activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  (Tr. 1558).

with coping with work related stressors and interactions w[ith] co-workers and supervisors" and also "struggle[d] at times w[ith] carrying out instructions." (*Id.*).[6]  Dodds also opined that Mathews was "seriously limited" in traveling in unfamiliar places. (*Id.*).[7]  Based on Dodds's observations, Mathews "struggle[d] w[ith] social interactions at times and ha[d] worked to process this in t[reatment]," had "difficulties w[ith] personal hygiene and maintaining cleanliness," "struggle[d] at times w[ith] traveling outside of [the] county and live[d] in [an] area where he c[ould] get to amenities using public transportation." (*Id.*).

Based on Mathews's impairments, Dodds anticipated that Mathews would be absent from work approximately four days per month and opined that his impairments had lasted or could be expected to last at least twelve months. (Tr. 1560).  Dodds further explained that Mathews struggled with "maintaining a consistent pace and being able to manage psychiatric symptoms while in a competitive work environment." (*Id.*).  For these reasons, Dodds opined that Mathews could not engage in full-time competitive employment on a sustained basis. (*Id.*).

The ALJ reviewed Dodds's opinion and afforded it "little weight," reasoning that the opinion was internally inconsistent, as well as inconsistent with the record as a whole. (Tr. 24).  The ALJ specifically discounted Dodds's opinion that Mathews could not maintain regular attendance and be punctual, pointing out that "[w]hile [Mathews] missed a few appointments with Ms. Dodds, the records from the [Personalized Recovery Oriented Services ("PROS")] program show[ed] [that Mathews] regular[ly] attend[ed]." (*Id.* (citing Tr. 420-1550)).  Moreover, the ALJ highlighted that Mathews "reported doing better under the

---

[6]  Dodds opined that Mathews was limited in performing unskilled work but, in that context, could satisfactorily remember work-like procedures, understand and remember very short and simple instructions, and carry out very short and simple instructions, among other things. (Tr. 1558).

[7]  "Seriously limited" on the mental RFC questionnaire was defined to mean that a patient's "ability to function in [an] area [was] seriously limited and would frequently be less than satisfactory in any work setting." (Tr. 1558).

care of Ms. Dodds and Dr. Varallo," citing generally to Mathews's treatment notes at the Clinic.
(*Id.* (citing Tr. 288-367)).  In the ALJ's view, Mathews's GAF score of 60 was also "inconsistent
with the significant limitations indicated" by Dodds.  (*Id.*).  Finally, the ALJ noted that Dodds, as
a social worker, was not an acceptable medical source and that her "opinion, standing alone,
c[ould not] constitute documentation of severe or disabling vocational limitations."  (*Id.*).

   In my estimation, the ALJ's explanation for discounting Dodds's opinion, while
not a model of clarity, was sufficient and supported by substantial evidence in the record.
Initially, the ALJ correctly observed that Dodds was not an "acceptable medical source."
(Tr. 24).  As a result, her opinion was not entitled to any special weight.  *See Meyers v. Comm'r*
*of Soc. Sec.*, 2020 WL 923413, *5 (W.D.N.Y. 2020) ("[a]s an initial matter, by virtue of her
status as a social work, [plaintiff's treating licensed social worker's] opinions are not entitled to
any special weight"); *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d at 398 (same).

   More importantly, the ALJ's decision reveals that he considered other reasons for
discounting her opinion.  Specifically, the ALJ pointed out that Mathews reported "doing better"
throughout his treatment at the Clinic, suggesting that Dodds's treatment notes do not support
her rather restrictive mental RFC assessment.  Based on this Court's review, the ALJ's
assessment of those treatment notes appears fair.

   As the ALJ recognized, Mathews attended therapy sessions with McCumiskey
and Dodds "on a somewhat regular basis" from April 2014 through September 2015.  (Tr. 22).
During those sessions, Mathews consistently reported problems relating to depression and
periods of anxiety, irritability, and lack of energy/motivation – all of which stemmed largely
from stressors involving his living, family, and financial circumstances.  (*See id.*; *see also*, *e.g.*,
Tr. 289-90 (initial psychiatric evaluation completed by Varallo on July 28, 2014, at which

Mathews "was able to identify adequate stressor in that his family is being evicted from their

residence and the family is going to have to split up due to financial issues"); Tr. 322 (Dodds's

first therapy session with Mathews on August 26, 2014, during which Mathews "expressed his

frustration and anger . . . regarding his current living situation and financial situation"); Tr. 328

(October 10, 2014 therapy session during which Mathews "reported to [Dodds] that he continues

to struggle to maintain a positive attitude in his current living environment")).  One of

Mathews's principal treatment goals was to find a suitable housing situation and employment to

enable him to live independently.  (*See*, *e.g.*, Tr. 304 (McCumiskey's May 6, 2014 treatment

note: Mathews "continues to focus on finding employment"); Tr. 306 (McCumiskey's May 27,

2014 treatment note: Mathews's "focus[] [is] on obtaining employment and moving out of his

home due to the level of stress he experiences at home"); Tr. 322 (Dodds's August 26, 2014

treatment note: Mathews "currently looking for a new job and a new place to live"); Tr. 344

(Dodds's March 12, 2015 treatment note: Mathews "has continued to look for a job"); Tr. 348

(Dodds's April 13, 2015 treatment note: since last appointment on March 27, 2015, Mathews

"filled out two housing applications as well as applied for [two] jobs")).  These records make

clear that during this period Mathews was able to actively seek housing and employment in order

to improve his situation.[8]

In addition, although Mathews presented to these therapy sessions in varying

moods, ranging from depressed to irritated to anxious, his mental health status examinations

were otherwise consistently unremarkable.  For example, he repeatedly engaged well with Dodds

during therapy sessions, appeared cooperative, had appropriate affect, demonstrated intact

thought process and logical and goal-directed thought content, and had fair insight and judgment.

---

[8]  At the administrative hearing on December 15, 2017, Mathews testified that he was currently living by himself in an apartment.  (Tr. 41).

(*See generally* Tr. 322-67).  Moreover, Dodds often noted that Mathews appeared receptive to treatment and that Mathews seemingly improved throughout his therapy sessions, albeit with varying levels of progress and motivation in achieving his goals.  (*See*, *e.g.*, Tr. 324-25 (Dodds's September 11, 2014 treatment note: "[Mathews] is making progress towards his goals and is consistent with keeping his appointments[;] [Mathews] continues to show motivation to meet his goals"); Tr. 328-29 (Dodds's October 11, 2014 treatment note: "[Mathews] has maintained his progress since last session"); Tr. 334-35 (Dodds's November 11, 2014 treatment note: Dodds's opinion was that Mathews "maintained his progress since last session and continue[d] to show motivation to make improvements," but Mathews's own view was that he "ha[d] not made any progress since last session"); Tr. 336-37 (Dodds's December 2, 2014 treatment note: "[Mathews] has been making progress towards identifying and working through barriers"); Tr. 338-39 (Dodds's February 12, 2015 treatment note: Mathews "has made some progress and maintained some of his progress, but struggles to be consistent with appointments and following through on recommendations of [Dodds]"); Tr. 344-45 (Dodds's March 12, 2015 treatment note: "[Mathews] has maintained progress since last session[;] [Mathews] has made minimal progress during review period with goals of his [treatment] plan[;] [Mathews] recognizes his goals and what he desires to achieve, but shows little motivation/drive to follow through"); Tr. 346-47 (Dodds's March 27, 2015 treatment note: Mathews "agreed" that his treatment goals were "attainable," but Mathews appeared to "struggl[e] [to] motivat[e] himself even when given resources by [Dodds] and other service providers to make changes to his situation"); Tr. 355 (Varallo's July 20, 2015 medication management note: Mathews reported that he found his therapy sessions to be "helpful"); Tr. 365-66 (Dodds's September 15, 2015 treatment note:

Mathews reported "being able to maintain progress since last session," and Dodds noted that Mathews "appear[ed] to be making consistent progress at this time")).

On balance, based on Mathews's largely unremarkable mental status examinations and his demonstrated ability to pursue treatment goals and make progress during the course of his treatment, I agree with the ALJ's assessment that Dodds's treatment notes do not support her mental RFC assessment.  In fact, during Dodds's September 15, 2015 therapy session with Mathews, she and Mathews discussed "returning to work and what he fe[lt] he would be able to handle in the work place."  (Tr. 365).  Mathews responded that "he *desire[d] not* to work currently, but would like to return to work in the future," prompting Dodds to discuss with Mathews that his "continuing to look for a job and getting money set aside for an apartment and such would benefit him and assist him when he goes to find his own apartment." (*Id.* (emphasis supplied)).  On this record, the ALJ reasonably found that Dodds's treatment notes from the Clinic were at odds with her mental RFC assessment that Mathews was unable to engage in full-time competitive employment on a sustained basis.  *See*, *e.g.*, *Coleman*, 335 F. Supp. 3d at 398-99 (ALJ properly assigned "little weight" to social worker's opinions that plaintiff was unable to work, where social worker's mental health assessments of plaintiff revealed "only moderate limitations in almost every level of mental functioning," mental health treatment notes revealed plaintiff's "improvement in handling the limitations caused by his mental impairment," and "despite her stated opinion that [p]laintiff [was] unable to work, [social worker] repeatedly encouraged [p]laintiff to start working").

In addition, the ALJ adequately explained his decision to discount Dodds's opinion that Mathews was "unable to meet competitive standards" in "maintain[ing] regular attendance and be[ing] punctual within customary, usually strict tolerances."  (Tr. 24, 1558).  In

evaluating this limitation, the ALJ noted that "[w]hile [Mathews] missed a few appointments with Ms. Dodds, the records from the PROS program show regular attendance."  (Tr. 24 (citing Tr. 420-1550)).  Mathews contends that the ALJ mischaracterized the record regarding his attendance at PROS sessions.  (*See* Docket # 11-1 at 14 ("[t]he ALJ mischaracterized [p]laintiff's absences as being 'few,' as the PROS staff stated he only *attended* 'some' and 'few' sessions and noted he had limited progress because of his absences")).

I do not find that the ALJ mischaracterized the record in this regard.  Contrary to Mathews's contention, the ALJ's reference to a "few" absences related to Mathews's attendance at Dodds's therapy sessions, not his attendance at PROS; instead, the ALJ stated that Mathews's attendance at PROS was "regular."  While Mathews accurately identifies instances of inconsistent attendance at PROS (*see*, *e.g.*, Tr. 1469, 1489, 1508, 1520, 1546, 1553), the record contains over 1,100 pages from Mathews's PROS program, spanning from July 2015 to March 2017, during which Mathews attended many sessions (*see generally* Tr. 420-1550).  In fact, Mathews reported to Dodds on several occasions that he was continuously going to PROS.  (*See*, *e.g.*, Tr. 360 ("[Mathews] explained to [Dodds] that he has been continuously going to PROS during the week and finds the program helpful to him[;] . . . [Mathews] shared that he has not been engaging in job search due to attending PROS"); Tr. 365 ("[Mathews] shared that he continues to go to PROS daily and reports that he finds the groups helpful")).  Thus, even if his attendance was inconsistent at times, the ALJ reasonably concluded that Mathews's attendance at Dodds's therapy sessions and PROS "show[ed] [Mathews] [was] capable of following a schedule."  (Tr. 24).  *See*, *e.g.*, *Della M. v. Comm'r of Soc. Sec.*, 2020 WL 1030645, *6 (N.D.N.Y. 2020) (ALJ appropriately rejected consultative examiner's opinion that claimant had marked limitations in maintaining a regular schedule/attendance based on, among other things,

claimant's ability to attend medical appointments); *Marvin v. Colvin*, 2014 WL 1293509, *6 (N.D.N.Y. 2014) (no error where ALJ discounted opinion of consultative psychologist that claimant would have difficulty maintaining a schedule because the "record indicate[d] that [claimant] regularly attend[ed] her methadone treatment and appointments").

Finally, the ALJ did not err by considering the apparent inconsistency between Dodds's restrictive mental RFC assessment and the GAF score of 60 she assessed.  To be sure, "[a] GAF score, standing alone, is not a good reason to assign little weight" to opinion evidence from a medical source.  *Narvaez v. Comm'r of Soc. Sec. Admin.*, 2019 WL 4386030, *12 (S.D.N.Y. 2019); *see also Garcia v. Colvin*, 2015 WL 1280620, *8 (W.D.N.Y. 2015) ("the ALJ was not permitted to discount [mental health counselor's] assessment *solely* on the basis of th[e] alleged inconsistency [between mental health counselor's assessed limitations and claimant's GAF score of 60]") (collecting cases).  Among other information, however, an ALJ may properly consider whether a medical source's opinion is consistent with the GAF score assessed by that source.  *See Narvaez v. Comm'r of Soc. Sec. Admin.*, 2019 WL 4386030 at *13 ("[n]onetheless, an ALJ may rely on a GAF score in conjunction with other evidence and is entitled to weigh conflicting evidence in assigning weight" to opinion evidence); *see also Garcia v. Colvin*, 2015 WL 1280620 at *7 (collecting cases).

Importantly, the ALJ did not rely solely on Dodds's assessed GAF score in discounting her mental RFC assessment; instead, it was one of several considerations the ALJ weighed.  Moreover, the ALJ explicitly assigned only "limited weight" to the GAF scores in the record, suggesting that he was aware of the limited value of GAF scores.  (*See* Tr. 22 n.1).  In view of the fact that the ALJ discounted Dodds's opinion based only in part on the GAF score, I do not find that the ALJ erred in considering this evidence.  *See*, *e.g.*, *Healy v. Comm'r of Soc.*

*Sec.*, 2020 WL 1428931, *6 (W.D.N.Y. 2020) ("[a] plain reading of the ALJ's decision demonstrates that the ALJ referred to the GAF scores identified by [plaintiff's mental health counselor and licensed social worker] to show that some of the limitations they identified were inconsistent with such scores[;] [f]or example, the ALJ noted that [licensed social worker] assigned [p]laintiff a GAF score of 55[;] . . . [a] GAF score 51-60 indicates moderate symptoms or moderate difficulties in social, occupational, or school functioning[;] . . . [a]s such, it was not unreasonable for the ALJ to conclude that [licensed social worker's] opinion identifying mostly marked limitations and her conclusion that [p]laintiff was unable to function independently outside her home was internally inconsistent, in part, with the GAF score she assessed") (alterations and quotations omitted).

Although the ALJ did not explicitly consider each of the factors for weighing opinion evidence outlined above, I find that he appropriately considered Dodds's opinion in the context of the whole record and provided reasons that, taken together, sufficiently explained his rationale for discounting Dodds's mental RFC assessment. Accordingly, I conclude that the ALJ acted within his discretion in assigning the opinion "little weight" and that remand is not warranted on this basis.

**B.      The ALJ's RFC Determination**

I turn next to Mathews's contention that the ALJ's rejection of the opinion evidence created an evidentiary gap in the record that resulted in a mental RFC determination based on the ALJ's own lay opinion. (Docket # 11-1 at 16-20). Again, I disagree.

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making

an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010) (summary order).

Mathews is correct that the ALJ did not assign controlling weight to any opinion evidence assessing Mathews's mental impairments in reaching the RFC determination. (*See* Tr. 24). As discussed above, the ALJ assigned "little weight" to Dodds's opinion, and he also assigned "little weight" to the opinion of non-examining state agency psychologist T. Bruni ("Bruni"), PhD. (Tr. 24, 81-91).[9]

Simply because the ALJ did not assign controlling weight to any opinion does not mean, however, that he "rejected" the medical opinion evidence in the record. Indeed, an ALJ does not necessarily "reject" opinion evidence when the opinion is assessed less than controlling weight and where, as here, the ALJ's RFC determination incorporates limitations contained in that opinion.[10] *See, e.g., Cottrell v. Comm'r of Soc. Sec.*, 2019 WL 201508, *3 (W.D.N.Y. 2019)

---

[9]  Mathews does not contend that the ALJ erred in evaluating and weighing Bruni's opinion; in fact, the ALJ assessed greater mental limitations than Bruni, who found that Mathews's affective disorders were non-severe. (*See* Tr. 83, 89; *see also* Tr. 24 (discounting Bruni's opinion and stating that "[c]onsidering [Mathews] has continued symptoms of anxiety and depression, the [ALJ] has provided additional limitations in the [RFC] as addressed above which are consistent with the record as a whole")).

[10]  Irrespective of the terminology used by the ALJ, whether it be "great weight," "little weight," "some weight," or "no weight," the relevant inquiry is whether the ALJ in fact incorporates or accounts for the limitations assessed by the medical professional in the RFC, as opposed to basing the RFC upon his or her own lay interpretation of the medical evidence. *Compare Freeman v. Comm'r of Soc. Sec.*, 2019 WL 2016585, *4 (W.D.N.Y. 2019) (RFC not supported by substantial evidence where ALJ gave "little weight" to the only medical

("[c]ontrary to [claimant's] assertion, the ALJ did not wholly reject [the doctors'] opinions; instead, she afforded them 'partial' and 'some' weight and . . . relied on portions of them to determine [claimant's] RFC[;] . . . [j]ust because the ALJ did not afford either opinion controlling weight does not mean that she substituted her own view of the medical evidence for those opinions"); *see also Harris v. Berryhill*, 2017 WL 4112022, *3 (W.D.N.Y. 2017) ("[p]laintiff contends that the ALJ improperly 'rejected' [doctors'] opinions [which the ALJ afforded 'less than significant weight'] without citing to another medical opinion[;] [p]laintiff overstates the ALJ's actions[;] [t]he ALJ did not 'reject' these opinions[;] [t]o the contrary, he gave them some weight and incorporated certain of the limitations set forth therein into his RFC finding"); *Bockeno v. Comm'r of Soc. Sec.*, 2015 WL 5512348, *5 (N.D.N.Y. 2015) ("the ALJ did not outright reject [doctor's] opinion, but afforded his opinion 'little weight'[;] [t]he ALJ's RFC determination includes non-exertional mental limitations, some of which are consistent with the limitations imposed by [doctor] and supported by other medical evidence in the record").

My review of the record reveals that the ALJ, although assigning "little weight" to Dodds's opinion, actually reached an RFC determination that is consistent with and incorporates many aspects of Dodds's opinion.  Specifically, the ALJ found Mathews's adjustment disorder to

---

opinion of record and failed to account for resting and lifting limitations assessed in the opinion); *Nanartowich v. Comm'r of Soc. Sec. Admin.*, 2018 WL 2227862, *9 (W.D.N.Y. 2018) (ALJ's discounting of only medical opinions of record created evidentiary gap in the record; "the ALJ explicitly accorded 'little weight' to the opinions [of the physicians], . . . and nothing suggests that the ALJ accounted for the limitations identified by these physicians in formulating the RFC"); *Wilson v. Colvin*, 2015 WL 1003933, *21 (W.D.N.Y. 2015) ("[a]fter discounting the opinions, the ALJ determined that [plaintiff] retained the physical RFC to perform the full range of light work[;] . . . it is unclear how the ALJ arrived at this RFC or which impairments he considered in formulating his assessment"); *Gross v. Astrue*, 2014 WL 1806779, *18 (W.D.N.Y. 2014) (RFC not supported by substantial evidence where "[a]fter discounting [the physician's] opinion," the ALJ formulated the RFC "through her own interpretation of various MRIs and x-ray reports contained in the treatment records"); *with Burch v. Comm'r of Soc. Sec.*, 2019 WL 922912, *6 (W.D.N.Y. 2019) ("[a]lthough the ALJ accorded limited weight to both opinions, her RFC assessment nonetheless accounts for the majority of the limitations assessed by both doctors"); *Harrington v. Colvin*, 2015 WL 790756, *17 (W.D.N.Y. 2015) (same); *Crawford v. Astrue*, 2014 WL 4829544, *21 (W.D.N.Y. 2014) ("the ALJ's RFC assessment adopted the limitations assessed by [the physician] that were supported by the evidence and . . . his decision to afford [the physician] limited weight did not create a gap in the record").

be severe at step two and limited Mathews to routine and repetitive tasks only, tasks requiring no more than occasional public contact or interactions with coworkers, and tasks without a strong production pace element. (Tr. 18, 20). Moreover, the jobs identified by the ALJ at step five of the sequential analysis were all unskilled positions with an SVP level of two. (Tr. 26). These limitations align with Dodds's view that Mathews was more limited in the context of semi-skilled and skilled work than unskilled work. (Tr. 1558-59). Moreover, the limitations reasonably incorporate certain of Dodds's assessed limitations, such as Mathews's limited abilities to perform at a consistent pace without an unreasonable number and length of rest periods, to ask simple questions or request assistance, to respond appropriately to changes in a routine work setting, and to deal with normal work stress. (Tr. 1558).

In addition, the RFC also takes account of Dodds's most consistent explanation for her assessed limitations. Dodds explained in the mental RFC questionnaire that her assessed limitations were based on Mathews's struggles with work-related stress, interacting with coworkers and supervisors, carrying out instructions, maintaining a consistent pace, and managing his psychiatric symptoms in a work setting. (Tr. 1559-60). Her assessment is consistent with Mathews's hearing testimony during which he explained that he struggled in social environments and with keeping focus and concentration. (Tr. 47-48). The ALJ's RFC credits these limitations and accommodates his associated work-related restrictions by limiting his interactions with the public and coworkers, limiting his production pace, and by restricting him to unskilled work consisting only of routine and repetitive tasks. *See*, *e.g.*, *Johnson v. Berryhill*, 2018 WL 4539622, *6 (W.D.N.Y. 2018) ("[c]ontrary to [p]laintiff's argument, the ALJ included significant mental limitations in the RFC finding, including limiting [p]laintiff to simple, routine tasks – a limitation which accounts for [consultative psychiatrist's] findings

regarding [p]laintiff's difficulties in maintaining attention and concentration, performing complex tasks, and learning new tasks"); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 315 (W.D.N.Y. 2013) (ALJ's conclusion that claimant could perform "simple, routine, and repetitive tasks and that he could not perform production rate or pace work" was consistent with claimant's limitations with using judgment, responding to supervision and coworkers, dealing with changes in the work setting, and difficulties with concentration, persistence or pace).

On this record, I find that the ALJ incorporated and accounted for most of the limitations assessed by Dodds (other than Dodds's opinion regarding Mathews's limited ability to maintain regular attendance and be punctual in a work setting, which, for the reasons discussed above, I find the ALJ did not improperly discount), as opposed to basing the mental portion of the RFC upon his own lay interpretation of the medical evidence. I also find, for the reasons stated above, that the ALJ's mental RFC determination is otherwise supported by substantial evidence. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole"); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (the ALJ is "not require[d] . . . [to] mention[] every item of testimony presented to him or . . . explain[] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability"). Thus, remand is not warranted on this basis.

## <u>CONCLUSION</u>

After a careful review of the entire record, this Court finds that the

Commissioner's denial of DIB and SSI was based on substantial evidence and was not erroneous

as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above,

the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **GRANTED**.

Mathews's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Mathews's

complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                   *s/Marian W. Payson*
                                   MARIAN W. PAYSON
                           United States Magistrate Judge


Dated: Rochester, New York
        July 29, 2020